UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

v.

CHAUNCEY JACKSON

Case No:  2:13-cr-28-FtM-29DNF

_____

### REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

 **I.**  **Introduction**

   This cause is before the Court on Defendant Chauncey Jackson's ("Defendant") Motion for Pre-trial Suppression Hearing and Memorandum of Law in Support Thereof ("Motion to Suppress") (Doc. 26) filed on June 4, 2013.  The Government filed a Response to Defendant's Motion for Pre-trial Hearing (Doc. 31) on June 21, 2013, and a Response to Defendant's Motion to Suppress Evidence (Doc. 32) on July 2, 2013.  Defendant is charged with one count of Possession of a Firearm by a Convicted Felon, in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), and 924(e)(1).  This matter was referred to the Court for a report and recommendation and an evidentiary hearing was held on July 9, 2013.  Pursuant to the Court's permission, Defendant filed a Notice of Additional Authority and Discussion (Doc. 35) on July 11, 2013.  For the reasons explained below, the Court respectfully recommends that Defendant's Motion to Suppress be **DENIED**.

 **II.**  **Hearing Testimony**

   The Government presented the testimony of only one witness, Sergeant Aaron Olson of the Fort Myers Police Department.  Sergeant Olson's testimony revealed the following:

Sergeant Olson has worked for the Fort Myers Police Department for seven years and was the supervisor of the Violent Crime Task Force on the night of the incident at issue. (Tr.[1] 3-4).  The Violent Crimes Task Force concentrates on violent crimes involving drugs, guns, and murder, and focuses on the areas in Fort Myers most prone to violent crime. (Tr. 4).

On August 30, 2012, at approximately 1:20 a.m., Sergeant Olson was patrolling the central district of Fort Myers in a marked police vehicle when he began surveillance of two motor vehicles in the vicinity of Royal Palm Avenue, Crawford Street, and Maple Street. (Tr. 5).  Sergeant Olson described this as a high crime area. (Tr. 6).  One of the vehicles observed was a blue Mercury. (Tr. 5).  Sergeant Olson observed the vehicles circling the block at a very low rate of speed. (Tr. 5).  Based on his experience, Sergeant Olson found this activity suspicious. (Tr. 5).  Sergeant Olson called other task force units to the area to set up a perimeter in case something happened if any stop was made. (Tr. 6).  Sergeant Olson lost sight of the blue Mercury and was not able to locate it. (Tr. 6).

Approximately ten minutes later, while he was traveling westbound on Edison Avenue, Sergeant Olson observed the blue Mercury on Grand Avenue going southbound towards Edison Avenue. (Tr. 6).  Sergeant Olson observed the blue Mercury go through the stop sign posted at Grand Avenue and Edison Avenue without stopping. (Tr. 6).  The blue Mercury was traveling at a speed of approximately five to ten miles per hour when it went through the stop sign. (Tr. 7).  Based on this traffic infraction, Sergeant Olson attempted to initiate a traffic stop. (Tr. 6).

When Sergeant Olson got behind the blue Mercury as it was going southbound on Grand Avenue, the driver of the vehicle accelerated to a high rate of speed. (Tr. 7).  The blue Mercury quickly turned eastbound on Layette Street and then very quickly entered a driveway

---

[1] "Tr." refers to the Transcript (Doc. 36) of the hearing held on July 9, 2013.

located at 2134 Jeffcot Street. (Tr. 7, 16).  Sergeant Olson testified that he knew that the driveway the blue Mercury turned into was not the vehicle's occupants' driveway because he knew the actual resident. (Tr. 7).  Sergeant Olson pulled his car in behind the blue Mercury at an angle such that he could see the blue Mercury through his windshield and out the right-hand passenger front window. (Tr. 19).  Sergeant Olson turned on his emergency lights as the vehicle turned into the driveway. (Tr. 7).  Sergeant Olson testified that the area on Jeffcot Street was not well lit, but that his headlights were on and his spotlight was positioned on the blue Mercury so that it was well illuminated. (Tr. 8, 19, 21).  Sergeant Olson observed two people in the front seats and two people in the back seat. (Tr. 21).

Sergeant Olson immediately got out of his vehicle and began walking towards the driver's side of the blue Mercury. (Tr. 7-8).  When he had approximately reached the left side of the trunk, Sergeant Olson noticed the left rear passenger of the vehicle lean over the right rear passenger and reach into the pocket on the back side of the front passenger's seat.[2] (Tr. 8, 21).  Sergeant Olson testified that he could not tell if the individual was putting something into the pocket or taking something out of the pocket. (Tr. 21-22).  Sergeant Olson testified that he could not see any object in the person's hand. (Tr. 22).  Sergeant Olson testified that based on his experience, he believed that it was unsafe to approach the vehicle any further until backup arrived. (Tr. 8).

Sergeant Olson called for backup and Officer Eppler of the Fort Myers Police Department arrived on the scene in less than a minute.[3] (Tr. 9).  Sergeant Olson informed

---

[2] Sergeant Olson described the location of the pocket that Defendant reached towards in various, sometimes inconsistent ways.  Sergeant Olson's testimony as a whole, however, indicates that he saw Defendant reach towards a pocket located on the backside of the passenger's side front seat.

[3] At least two other police officers, Officer Ciulla and Officer Schulze, arrived at the scene.  The Court notes that Sergeant Olson's testimony is unclear as to when precisely they arrived. (Tr. 29-30).

Officer Eppler that the left rear passenger had possibly retrieved or placed a weapon in the back seat of the right side of the vehicle. (Tr. 9).

Sergeant Olson and Officer Eppler ordered the occupants inside the vehicle to step out. (Tr. 9, 31). Sergeant Olson testified that the occupants were ordered to step out of the vehicle for his and Officer Eppler's safety. (Tr. 9). Sergeant Olson testified that he did not remember if the occupants of the vehicle were ordered to exit one at a time or two at a time. (Tr. 30). Sergeant Olson testified that he could not recall if the occupants of the vehicle were ordered to stand away from the vehicle and in separate locations after exiting the vehicle. (Tr. 30). Sergeant Olson testified that could not recall if Defendant was ordered to exit the vehicle first. (Tr. 31). Sergeant Olson testified that he was not watching the occupants of the vehicle after they exited because he was searching the pocket on the back of the passenger front seat. (Tr. 30). None of the occupants resisted police commands. (Tr. 35).

After the vehicle's occupants exited, Sergeant Olson went to the back seat of the vehicle and searched the pocket on the rear of the passenger side front seat. (Tr. 9). Sergeant Olson found a Derringer handgun pointed upwards sitting on top of various other items. (Tr. 9). Sergeant Olsen seized the weapon and cleared it. (Tr. 10). No other contraband was found inside the vehicle. (Tr. 35). Sergeant Olson did not ask the driver of the car for permission to search the vehicle. (Tr. 34).

Sergeant Olson testified that Defendant was the passenger he observed reaching over the right rear passenger to the pocket. (Tr. 10). Immediately after Sergeant Olson found the Derringer, the police detained Defendant to make sure he did not have any weapons on his person, which he did not. (Tr. 10). Defendant was not patted-down for weapons until after Sergeant Olson located the Derringer in the back seat. (Tr. 31).

Sergeant Olson testified that he could not recall if he was present when Jamar James, another passenger in the vehicle, made any statement to the police. (Tr. 11).

### III.     Analysis

Defendant asserts three grounds for suppression in his Motion to Suppress.   First, Defendant challenges constitutionality of the stop.   Second, Defendant challenges the search of the vehicle and the seizure of the handgun from the vehicle.   Finally, Defendant challenges the constitutional admissibility of the statement made by Jamar James as an unattenuated, derivative seizure. (Doc. 26 p. 6-7).   The Government argues that Defendant does not have standing to challenge the constitutionality of Sergeant Olson's search and that the search of the blue Mercury was lawful.

### A.  Legality of the Traffic Stop

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . ." U.S. Const. amend. IV.   When a police officer stops a car for a traffic violation, the passengers within the care are considered seized under the Fourth Amendment. *Brendlin v. California,* 551 U.S. 249, 256 (2007).   Thus, a passenger in a car stopped by police has standing to object to the constitutionality of the stop. *Id.*   The stop will be considered constitutional when the police have probable cause to believe that a traffic violation has occurred. *Whren v. U.S.,* 517 U.S. 806, 810 (1996).

In this case, Defendant was a passenger in a vehicle stopped by the police and, thus, was seized under the Fourth Amendment at the moment of the traffic stop. *Brendlin,* 551 U.S. at 262.   Defendant has standing to challenge the constitutionality of the stop of the blue Mercury, even if he was not driving. *Id.* at 259.

Here, Sergeant Olson testified that he observed the blue Mercury pass through a stop sign at the intersection of Grand Avenue and Edison Avenue at a speed of approximately five to ten miles per hour. (Tr. 7).  Although Defendant argues that the "totality of the government's information provides no definitive indication for the vehicle stop at bar," Defendant did not challenge Sergeant Olson's testimony at the hearing and did not present any evidence showing that the blue Mercury did in fact stop at the stop sign. (Doc. 26 p. 7).  Under Florida law,

> every driver of a vehicle approaching a stop intersection indicated by a stop sign shall stop at a clearly marked stop line, but if none, before entering the crosswalk on the near side of the intersection or, if none, then at the point nearest the intersecting roadway where the driver has a view of approaching traffic on the intersection roadway before entering the intersection.  After having stopped, the driver shall yield the right-of-way to any vehicle which has entered the intersection from another highway or which is approaching so closely on said highway as to constitute an immediate hazard during the time when the driver is moving across or within the intersection.

Fla. Stat. § 316.123(1)(2)(a).  Given his observation of the blue Mercury failing to stop at the stop sign, Sergeant Olson had probable cause to believe that the driver of the blue Mercury had violated Fla. Stat. § 316.123(1)(2)(a).  Thus, Sergeant Olson's stop of the blue Mercury was constitutional. *Whren,* 517 U.S. at 810.  Accordingly, the seizure of the Derringer will not be suppressed as fruit of an unlawful traffic stop.

## B.  Legality of the Vehicle Search

Defendant argues that the duration of the stop and the scope of the search of the blue Mercury performed by Sergeant Olson violated Defendant's Fourth Amendment rights and, therefore, the seizure of the Derringer must be suppressed.  The Government argues that Defendant does not have standing to challenge Sergeant Olson's search of the blue Mercury.  Additionally, the Government argues that even if Defendant has standing, Sergeant Olson's search was a lawful protective sweep for his safety.

The Supreme Court has long held that "a defendant can urge the suppression of evidence obtained in violation of the Fourth Amendment only if that defendant demonstrates that *his* Fourth Amendment rights were violated." *U.S. v. Padilla,* 508 U.S. 77, 81 (1993) (emphasis in original) (citations omitted).   "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be asserted vicariously." *Alderman v. U.S.,* 394 U.S. 164, 174 (1969).   A defendant must establish that he or she had a legitimate expectation of privacy in the place that was searched in order to assert a violation of the Fourth Amendment. *Rawlings v. Kentucky,* 448 U.S. 98, 104 (1980).   The "legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society. *Rakas v. Illinois,* 439 U.S. 128, 143 n.12 (1978).   Although "[n]o one circumstance is talismanic to the Rakas inquiry," such factors as (1) whether the defendant had a possessory interest in the place searched or the property seized, (2) whether the defendant had the right to exclude others from that place, (3) whether the defendant exhibited a subjective expectation that it would remain free from governmental invasion, (4) whether the defendant took precautions to maintain his privacy, and (5) whether the defendant was legitimately on the premises. *U.S. v. Haydel,* 649 F.2d 1152, 1155-54 (5th Cir. 1981 Unit A July 1981) (citations omitted).

In this case, Defendant was a passenger in the left rear seat of the blue Mercury when it was lawfully stopped by Sergeant Olson.  Defendant did not have any possessory interest in the blue Mercury and denied that he was in possession of the Derringer handgun found by Sergeant Olson in his search.  Although it appears that Defendant was legitimately within the vehicle, Defendant had no right to exclude others from the vehicle and did not take any precautions to

maintain any subjective expectation of privacy in the vehicle.  In his Motion to Suppress and at the hearing, Defendant made no showing that he had a reasonable expectation of privacy in the blue Mercury.  Thus, the Court finds that Defendant had no expectation of privacy within the blue Mercury and his Fourth Amendment rights were not personally violated when Sergeant Olson searched the vehicle and seized the Derringer handgun.  Because his personal rights were not violated, Defendant lacks standing to challenge the constitutionality of the search and seizure performed by Sergeant Olson. *See Rakas*, 439 U.S. at 148 (holding that passengers in an automobile had no expectation of privacy in glove compartment or area under the seat of the car and, thus, could not challenge the constitutionality of the search).

Additionally, assuming that Defendant had standing to challenge the constitutionality of the search performed by Sergeant Olson, the Court still recommends that the motion be denied. A police officer may search the passenger compartment of an automobile, limited to those areas in which a weapon may be placed or hidden, if the police officer possesses "a reasonable belief based on 'specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant' the officers in believe that the suspect is dangerous and the suspect may gain immediate control of weapons." *Michigan v. Long,* 463 U.S. 1032, 1049 (1983) (citing *Terry v. Ohio,* 392 U.S. 1, 21 (1968)).  A police officer's belief that the suspect is dangerous and may gain immediate control of weapons will be found reasonable if "a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger. *Id.* (citing *Terry,* 392 at 27).  It is inconsequential to the permissibility of a vehicle search that the occupants of the vehicle have been removed from the automobile because, if the occupants are not arrested, they will be able to reenter the

automobile and have access to any weapons inside. *Riley v. City of Montgomery, Ala.,* 104 F.3d 1247, 1253 (11th Cir. 1997) (citing *Michigan,* 463 U.S. at 1051-52).

Here, Sergeant Olson first observed the blue Mercury in which Defendant was a passenger circling the block in the vicinity of Royal Palm Avenue, Crawford Street, and Maple Street at approximately 1:20 a.m.  This area was known by Sergeant Olson to be a high crime area.  Although he found this activity suspicious, Sergeant Olson did not initiate a stop of the vehicle.  After losing sight of the blue Mercury, Sergeant Olson regained sight of the blue Mercury approximately ten minutes later as it passed through a stop sign without stopping.  Sergeant Olson positioned his vehicle behind the blue Mercury and the blue Mercury accelerated at a high rate of speed.  The blue Mercury eventually came to a stop in a driveway that Sergeant Olson knew did not belong to the vehicle's occupants because he knew the actual owner of the driveway.  Sergeant Olson exited his vehicle and approached the driver side of the blue Mercury.  As he approached, Sergeant Olson saw Defendant lean over and either place or take something out of the pocket on the backside of the front passenger seat.  Sergeant Olson testified that he was concerned that Defendant may have armed himself and Sergeant Olson waited for backup to arrive before approaching the blue Mercury any further.  Given these circumstances—the time of the night, the high crime area, the acceleration of the blue Mercury, the fact that the blue Mercury turned into a driveway it did not belong in, and the furtive movement of Defendant—Sergeant Olson's belief that there may have been a weapon within the blue Mercury was justified and based on articulable facts.  Thus, the protective sweep of the blue Mercury did not violate Defendant's Fourth Amendment rights.

Defendant argues that Sergeant Olson's failure to immediately pat-down Defendant when he exited the blue Mercury undermines Sergeant Olson's claim that he had a

particularized and objective basis for believing Defendant had a gun. (Doc. 35 p. 6).   Sergeant

Olson actions as a whole, however, support his belief that Defendant had either armed himself

or could have immediately armed himself.   Sergeant Olson's testimony reveals that, upon

seeing Defendant make a furtive movement in the blue Mercury, he waited until backup arrived

before proceeding.   After backup had arrived and the occupants exited the vehicle, Sergeant

Olson immediately performed a search of the pocket he saw Defendant reach towards.   Upon

finding the Derringer handgun, which occurred just moments after beginning his search,

Defendant was detained and patted-down to ensure that he had no further weapons on his

person.   Contrary to Defendant's argument, Sergeant Olson's actions do not demonstrate that

he lacked a reasonable belief based on specific articulable facts that Defendant was armed or

capable of gaining immediate access to a weapon.

Because Defendant does not have standing to challenge the search of the blue Mercury

and because Sergeant Olson's search of the vehicle was a lawful protective sweep, the Court

recommends that the seized Derringer not be suppressed.

### C.  Statement by Jamar James

As the Court finds that Defendant lacked standing to challenge the search of the vehicle

and that the search was legal, the Court need not address Defendant's argument that a statement

made by Jamar James should be suppressed as derivative of an unlawful search and seizure.

 For the above reasons,

**IT IS RESPECTFULLY RECOMMENDED THAT:**

Defendant's Motion to Suppress be **DENIED**.

Respectfully recommended in Chambers in Fort Myers, Florida on July 22, 2013.


DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE



Copies furnished to:


Counsel of Record
Unrepresented Parties